E-FILED
Thursday, 03 November, 2016  09:12:31 AM
Clerk, U.S. District Court, ILCD

IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| GEORGE DIXON,<br>    Plaintiff,<br><br>v.<br><br>CAROLYN COLVIN, ACTING<br>COMMISSIONER OF SOCIAL<br>SECURITY,<br>    Defendant. | Case No. 4:15-CV-04133-JEH |

### Order and Opinion[1]

The Plaintiff, George Dixon, appeals the Defendant-Commissioner's denial of his application for disability insurance benefits and supplemental security income. He alleges that the Administrate Law Judge's ("ALJ") finding that Dixon is capable of standing for the time necessary to do light work is not supported by substantial evidence. This Court disagrees and, accordingly, DENIES Dixon's Motion for Summary Judgment (D. 8)[2] and GRANTS the Commissioner's Motion for Summary Affirmance (D. 13).

### I

Dixon was 47 years old at the time he applied for disability, wherein he alleged onset of disability beginning September 15, 2012. (Tr. 20). In the Function Report Dixon submitted to the Commissioner, he described the effects of his impairments on his ability to work as follows:

---

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (D. 17, 18).
[2] Citations to the Docket in this case are abbreviated as "D. __." Citations to the Record of proceedings before the Commissioner are cited as "Tr. __."

1

5. How do your illnesses, injuries, or conditions limit your ability to work?



(Tr. 234). At his hearing before the ALJ, Dixon elaborated that in 2000 he underwent a total replacement of his right knee and underwent surgery on his left knee in 2006, after which time he testified that he used a cane to walk. (Tr. 52). He maintained full-time employment intermittently after both of these surgeries, but Dixon testified that he could not now work because "I have to elevate my leg to keep the swelling down, heart rate. And there's no facility at a job for me to do that." (Tr. 48). But for the problems with his knees, Dixon believed he could work. *Id.*

He testified that he took no prescription medication for his knee pain, but instead took four or five ibuprofen pills daily, although he did take prescription medication for his blood pressure. (Tr. 50). He explained his sporadic treatment for his knee problems due to a lack of insurance, he not having the funds for the $20 charged by the community health center for a visit, although at the time of the hearing he did have a "medical card." (Tr. 49).

Regarding the medical record, it is indeed sparse. On September 14, 2012, Dixon presented at an emergency room complaining of swelling in his legs for the previous two days. (Tr. 294). The treating physician, Dr. Randall Bay, noted "only a mild amount of discomfort," "no discrete injury," and "no prior history of similar symptoms." (Tr. 294). Dr. Bay recommended Dixon use nonsteroidal anti-inflammatory medication for discomfort and that he rest, limit activity, and elevate

2

his leg "in the interim" between his ER visit and following up with his primary care physician. *Id.*

The medical records show no such follow-up visit, but instead next show another ER by Dixon on December 17, 2012 for knee pain due to a fall the previous night from stepping into a hole. (Tr. 330). No mention of previous pain unrelated to the fall was made. An x-ray was unremarkable, Dixon was prescribed Norco "as needed," and he was sent home to follow up with his primary care physician. (Tr. 333-34).

Again, the records reveal no follow-up visits related to Dixon's knee, although he did see Dr. Simran Jit twice in February of 2013 and once in March of that year for his hypertension. (Tr. 312-320). The treatment notes from these visits mention no issues or complaints of pain by Dixon; indeed, the notes don't mention issues with his knees at all. *Id.*

Then, in April of 2013, agency doctor James Hinchen examined Dixon. (Tr. 88-90). This doctor reviewed Dixon's medical records and concluded that he had no severe impairments. *Id.* In reaching this conclusion, Dr. Hinchen noted that Dixon's ER visits revealed no injury to his leg, mild discomfort reported, mild tenderness, some swelling, a normal range of motion, and no gait disturbances. *Id.* He also noted the lack of evidence of any further treatment beyond the ER visit. Given his conclusion that Dixon had no severe impairment, he did not opine on Dixon's functional abilities. *Id.*

Not until June 9, 2013, do any knee issues re-appear in the medical record when Dixon again showed up in the ER complaining of left knee pain that "began this morning when he woke up." (Tr. 341). Dixon reported that he had been told he needed surgery (although none of the preceding medical records indicate such advice) and that "this has been present for a long time." *Id.* The physical exam revealed a normal range of motion, however, and no swelling, albeit with

"tenderness." (Tr. 342). An x-ray was again unremarkable. (Tr. 344). The ER physician made "no acute findings on work up" and, again, sent Dixon home to follow up with his primary care physician. *Id.*

The next day, Dixon instead went to ORA orthopedics complaining of knee pain and stating that he was advised to follow up at ORA, although, in fact, he was told to follow-up with his primary care physician. (Tr. 325). At that visit, he told Dr. Michael Berry that "yesterday" he began to experience left knee pain. He claimed he received cortisone injections into his left knee every 6 months "for many years," although, again, the medical records are devoid of treatment notes showing such treatment. *Id.* Dr. Berry examined Dixon and his previous x-ray. He noted radiographic signs of osteoarthritis, "a failed ACL reconstruction on the left, and likely the surgical procedure of choice is total knee arthroplasty." However, Dr. Berry recommended a cortisone injection and physical therapy. (Tr. 326). Dixon was not interested in physical therapy, however, claiming that it had been ineffective in the past, although no records show any physical therapy previously. *Id.* Rather, Dixon was "adamant" about having a total knee replacement. *Id.* He did, however, agree to the cortisone injection recommended by Dr. Berry that day. *Id.*

About three months later on September 18, 2013, he again saw Dr. Jit for his hypertension. As with his previous visits with Dr. Jit, no mention is made of any issues with Dixon's knees. (Tr. 307).

Over six months later on April 29, 2014, Dixon appeared again in the ER complaining about pain in his knees. (Tr. 345). This time, Dixon reported pain in both knees related to a fall occurring a "couple weeks ago." (Tr. 345). Examination of his knees revealed only tenderness; everything else was normal. (Tr. 347). X-rays of both knees, as with the two previous x-rays, were unremarkable. (Tr. 350-51). Like the two ER visits before, Dixon was discharged with instruction to follow-

up with CHC. And, also like before, the record reveals no such follow-up visit. He was prescribed Ultram for pain "as needed." (Tr. 352).

The last medical record is Dixon's orthopedic consultative examination with Dr. James Elmes, the Commissioner having arranged this examination at the request of Dixon's counsel. (Tr. 353). Dr. Elmes noted Dixon walked with a cane and favored his left leg. He noted somewhat diminished strength in both legs, decreased sensation in the left leg compared to the right, tenderness in the right knee, and crepitus in the left knee. *Id.*

The ALJ considered all this evidence and concluded that the evidence supported the following Residual Functional Capacity (RFC):

> light work as defined in 20 CFR 404.1567(b) and 416.967(b) except occasional climbing of ramps/stairs; no climbing ladders, ropes, or scaffolds; occasional stooping, crouching, crawling, kneeling and balancing; occasional reaching overhead with the right arm; and is limited to simple, routine, and repetitive tasks.

(Tr. 24). In making this finding, she concluded that the diagnostic or objective findings in the medical record do not support a conclusion that Dixon is unable to engage in substantial gainful activity, that the opinion evidence in the record confirmed such a finding, and that Dixon's claims regarding the intensity, persistence and limiting effects of his symptoms was not entirely credible. (Tri. 25-28). Dixon claims in this Court that the ALJ's RFC determination was not supported by substantial evidence.

## II
## A

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great

deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. §§ 404.1566, 416.966 (1986). The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five- step test. *See* 20 C.F.R. §§ 404.1520, 416.920. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;
2) suffers from an impairment that is severe or whether a combination of her impairments is severe;
3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4)      is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5)      is unable to perform any other work existing in significant numbers in the national economy.

*Id*. An affirmative answer at any step leads either to the next step of the test, or at steps three and five, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step three, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps one through four. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). In the instant case, the Plaintiff's challenges the ALJ's determination at step four.

**B**

The ALJ's RFC determination was more than supported by substantial evidence in this case.

First, as the ALJ noted in her decision, the objective medical evidence did not support a conclusion that Dixon was totally disabled by his alleged knee complaints. Dixon saw Dr. Jit regularly for his hypertension, yet, not once do the treatment notes reflect that Dixon ever made a complaint to this doctor or sought treatment for any problems with his knees. Rather, all of Dixon's medical records regarding knee complaints consist of three ER visits for acute issues such as falls. As the treatment notes from his ER visits demonstrate, Dixon's complaints of knee pain typically began immediately before his ER visits, x-rays and physical examinations revealed nothing out of the ordinary other than claimed tenderness, and no long term treatment was every recommended or prescribed at those visits. Moreover, at each and every one of these ER visits, Dixon was advised to follow-up with his primary care physician—

7

something he never did after any of them. He did, however, see an orthopedic specialist after one of his ER visits.

When he saw that specialist the day after his ER visit, Dixon told the orthopedic specialist that the ER physician advised him to follow up at ORA, although, in fact, the ER treatment notes demonstrate he was told to follow-up with his primary care physician. (Tr. 325). He also claimed he received cortisone injections into his left knee every 6 months "for many years," although, the medical records are devoid of treatment notes showing such treatment. Dr. Berry recommended a cortisone injection and physical therapy, but Dixon said he was not interested in physical therapy, claiming that it had been ineffective in the past. Like the alleged cortisone injections, no medical records support this claim made by Dixon to Dr. Berry. Rather, Dixon was "adamant" about being treated with a total knee replacement.

Dixon now faults the ALJ for failing to mention the examination made by Dr. Berry. True, the ALJ mistakenly stated that Dixon never sought treatment with an orthopedist. However, this statement is harmless error at most. First, Dixon mischaracterizes Dr. Berry's treatment note when stating that it was his opinion that Dixon needed a total knee replacement. In fact, Berry stated that such treatment would be the likely *surgical* treatment of choice. (Tr. 326). The *actual* treatment he proposed, however, was *non-surgical*, consisting of physical therapy and a cortisone injection. Dr. Berry did not opine that Dixon needed surgical intervention as he asserts. Moreover, Dr. Berry's treatment note, when compared to the evidence of record in the case, seriously calls Dixon's credibility into question.

Dixon claimed to see Dr. Berry at the ER physician's direction, but the direction was for him to follow up with a primary care physician, not an orthopedist. He claimed to have had cortisone injections, but there are no medical records to support that claim. He claimed to have had failed physical therapy, but there are not medical records to support that claim either. He also insisted upon a knee replacement with Dr. Berry, despite Dr. Berry having recommended a much less drastic course of

8

treatment.  Tying this all together, had the ALJ considered this evidence, it is likely she would have concluded that Dixon saw Dr. Berry, who had no history or records concerning Dixon, in an attempt to mislead him into opining that Dixon needed a knee replacement—an opinion which Dr. Berry did not render despite Dixon's attempts. In light of all this, the ALJ's failure to delve into Dixon's visit with Dr. Berry could only have helped him, not hurt him.

Dixon also mischaracterizes the treatment note of ER physician, Dr. Bay. He claims that Dr. Bay opines that Dixon needs to elevate his legs to relieve swelling. However, it is obvious from the treatment note that Dr. Bay made this recommendation as an "interim" remedy to alleviate Dixon's swelling which had begun only two days prior to his visit with Dr. Bay. Nothing about this treatment note suggests it was anything other than a short term recommendation to alleviate a temporary condition. *See Hofman v. Astrue*, No. 08-3125, 2009 WL 1871923, at *5 (C.D. Ill. June 24, 2009) ("The ALJ interpreted this statement as an opinion that Hofman had a temporary limitation on his ability to work. Hofman had recently fallen down some stairs, and so, could be suffering from a temporary aggravation of his condition. The ALJ's treatment of Dr. Hegde's opinion was, thus, supported by the record."). It certainly was not a "medical opinion" on Dixon's ability to perform work, as Dixon characterizes it.

The objective medical evidence, in other words, supports the ALJ's RFC determination. Those records reveal three visits to the ER over a year and a half period for acute knee symptoms, all of which resulted in either no treatment at all, over the counter pain medication, or nonnarcotic pain medication "as needed." The one visit to an orthopedist was not made on the recommendation of any other physician, was influenced by a questionable medical history as reported by Dixon, and was never followed up upon by Dixon after that lone visit.

These objective medical records support the ALJ's decision not to fully credit Dixon's claims regarding his level of impairment, as do the other reasons cited by the

ALJ. For example, she notes that his claimed level of pain and impairment is inconsistent with the lack of medication to treat his condition. Although Dixon claims he did not have the money for any such medication, the record demonstrates that he was able to obtain regular medication for his hypertension. Moreover, no physician ever thought that a long-term course of prescription medication was necessary to treat Dixon's knee pain. He did not fail to take pain medication for his knee problems because he couldn't afford them; he didn't take such pain medications because no doctor saw the need for them on anything but a temporary basis to address acute issues.

Likewise, his claims about his inability to see a doctor regularly for his knee condition due to a lack of insurance are questionable. He saw Dr. Jit regularly on four occasions for his hypertension, yet he never once complained at those visits about knee pain. One would expect that if Dixon's knee impairment was as severe as he claimed, he would have sought treatment from Dr. Jit for that condition when he was already seeing the doctor for other reasons.

Finally, regarding the only medical opinion in the record provided by agency physician Dr. Hinchen, that opinion does not help Dixon. Dr. Hinchen concluded that Dixon did not even have a severe knee impairment sufficient to require the formulation of an RFC. He reviewed the medical records already discussed, *supra*, and Dr. Hinchen noted that Dixon's ER visit revealed no injury to his leg, mild discomfort reported, mild tenderness, some swelling, a normal range of motion, and no gait disturbances. He also noted the lack of evidence of any further treatment beyond the ER visit. Given his conclusion that Dixon had no severe impairment, he did not opine on Dixon's functional abilities. The ALJ noted this opinion, but actually gave Dixon more credit than did Dr. Hinchen by finding that his knee problems constituted a "severe impairment" sufficient to pass the "threshold" of step two. *See Curvin v. Colvin*, 778 F.3d 645, 648 (7th Cir. 2015), *quoting Castile v. Astrue*, 617 F.3d

4:15-cv-04133-JEH   # 19   Page 11 of 11

923, 926-27 (7th Cir. 2010) (citation omitted; *quoting Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999).

Dixon attempts to pick apart the ALJ's decision in various other ways, none of which require discussion by this Court. "In rendering a decision, an ALJ 'must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013), *quoting Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir.2005). The bottom line here is that the ALJ sufficiently built that logical bridge. The evidence barely establishes that Dixon's issues with his knees are a "severe impairment" at step two and most certainly does not establish a more restrictive RFC than found by the ALJ. There is not a shred of evidence in the record to suggest that Dixon cannot stand for the requisite amount of time as required for light work other than Dixon's own questionable claims of impairment—claims which the ALJ properly refused to fully credit.

## III

In light of the foregoing, the Plaintiff's Motion for Summary Judgment (D. 8) is DENIED and the Defendant's Motion for Summary Affirmance (D. 13) is GRANTED. This matter is now terminated.

*It is so ordered.*

Entered on November 1, 2016

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE